INHABITANTS OF the TOWN OF SABATTUS

v.

Gerard A. BILODEAU.

Supreme Judicial Court of Maine.

Sept. 28, 1978.

Cote, Cote & Hamann, P. A. by Richard G. Hamann, Lewiston (orally), for plaintiff.

Rocheleau & Fournier by Ronald P. Lebel, Lewiston (orally), for defendant.

Before POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ., and DUFRESNE, A. R. J.

**358**

ARCHIBALD, Justice.

The Town of Sabattus brought this suit on May 19, 1975, seeking a permanent injunction preventing Gerard Bilodeau from interfering with the Town's possession and use of a dam controlling the Sabattus River. The Town also sought compensatory damages for trespass and loss of use of the dam, and a declaration of the nature and extent of its interest in the dam. Mr. Bilodeau contended in his answer that the Town's interest had been terminated or, alternatively, the Town should be equitably estopped from asserting such interest as it might have. He also filed a counterclaim asserting that the Town was responsible for damage to his property from the accumulation of sewage sludge.

The parties agreed, pursuant to M.R. Civ.P. 53, to submit the case to a referee, reserving the right to object to acceptance of the referee's report. After hearing the referee submitted a report *recommending* that judgment be entered for Bilodeau on the Town's complaint, and for the. Town on Bilodeau's counterclaim. The Town timely objected to the acceptance of the report, whereas Bilodeau moved for its adoption as the ultimate judgment. The Superior Court accepted the referee's report in its entirety and ordered judgment accordingly. The Town filed a timely appeal, and obtained a temporary injunction restraining Bilodeau from interfering with its use of the dam, pending appeal. Bilodeau filed a cross-appeal, asserting the court erred in rejecting his counterclaim.

We deny the appeal and dismiss the cross-appeal.

### THE CROSS–APPEAL

■ The appellee's cross-appeal must be dismissed. Bilodeau failed to file any objection to the referee's report and, in fact, moved, without limitation, that the report be accepted. It is well established that failure to file timely written objection to a referee's report dissipates the right to appeal from the judgment resulting therefrom. *Concord Gen. Mut. Ins. Co. v. Home Indem. Company,* Me., 368 A.2d 596 (1977);

*Adams v. Alley,* Me., 340 A.2d 201, 206 (1975).

The appellee argues that since he chose not to object to the segment of the report which dealt with the counterclaim for the reason that he did not want to appeal from the judgment unless the Town did so, his appeal should now be considered because the Town did appeal. Defendant's counterclaim was not compulsory (M.R.Civ.P. 13) and, therefore, is treated as if it were an independent cause of action. We view his failure to object as an omission fatal to his appeal. We decline to adopt such a novel departure from established practice as that suggested. *See Mount Desert Yacht Yard, Inc. v. Phillips,* Me., 348 A.2d 16 (1975).

### FACTS

The referee's report contains an extensive finding underlying the background for the present litigation, which we will summarize. For many years the Town had relied on the dam, which impounded water from the Sabattus River, to support its fire protection system. A pumping station, piping, and a storage tank located on property adjacent to the dam made this system operative.

In 1939 the Town acquired title to the mill property now owned by the defendant and, in 1940, conveyed the property to the Royal Woolen Company. In this 1940 deed the Town reserved several specific privileges designed to preserve its right to use the impounded water for fire protection, including the right "to have the dam continue in condition to hold water for the purpose of operating and delivering fire service." Ultimately, the property conveyed to the Royal Woolen Company became the property of the defendant through conveyances which reserved essentially the same rights as those delineated in the 1940 deed.

Another company, Webster Rubber Company, had become obligated to maintain a water storage facility on its roof to which water was pumped from the mill pond and from which, through gravity, water was available to supply the Town's hydrant system.

Plans were initiated in the late 1960's to provide the Town with an adequate reservoir which, when completed, would obviate the need for the mill pond as a source of water for hydrant service. Knowing this, an attorney for Webster Rubber Company (which was in the process of being sold) conceived the idea that the time was appropriate to renegotiate the obligations incurred for the maintenance of the fire protection system.

In 1969 the Town was a party to the execution of an agreement designed to relieve the individual owners of property from any burdens previously incurred to support the prospectively obsolete system. When the new system became operative in 1970, deeds were exchanged to effectuate the 1969 understanding which had provided that the Town should continue to have rights in the dam *"to the extent that the Town presently possesses the right."*

Over the years the property owned by the defendant Bilodeau, not being used, had become not only economically obsolete but also hazardous. The Town and Bilodeau agreed that this property should be demolished and, on August 29, 1974, a permit from the Town was obtained to accomplish that end. At this point it should be noted that the dam crossing the Sabattus River was in fact a part of the Bilodeau property, being a projection easterly of the north wall of the mill property. The referee found as a fact that if the mill were completely demolished, the dam would be dangerously weakened. He also found that such demolition was Mr. Bilodeau's intention, including the dam. The underlying ground would then become marketable land. Naturally, the mill pond would no longer exist.

Mr. Bilodeau proceeded to start the demolition but his work thereon was halted by this legal proceeding before reaching a point which endangered the dam.

## LEGAL ISSUES

Basically, we are concerned with whether Mr. Bilodeau may lawfully proceed with the final demolition of the north wall of his building and of the dam itself. The referee ruled that, by virtue of the 1940 deeds, the Town owned an "easement" which allowed it to use the dam for fire protection purposes but concluded that, since the new water system was operative, "the easement . . . terminated when the old fire protection system became obsolete." The language of the 1970 deed did not enlarge the previous easement because, so the referee stated, "none was intended." [1]

For our purposes we *assume* that the 1969 contract and the 1970 deed extended the original easement created by the 1940 deeds beyond the right to use the dam to support the fire protection system. The 1970 deed from Bilodeau to the Town contained the following language:

> "[T]he right without objection from or any adverse claim from me to enter my land aforesaid for the purpose of repairing, maintaining, and even replacing at its present height the dam there situated, and further to control in its discretion the height of the water above said dam for the best advantage of the inhabitants of said town and of the riparian abutters, all without any obligation thereby on the part of the inhabitants to repair, maintain or replace said dam."

It should be noted that the easement thus created has no terminal point nor does it require *either party* to "repair, maintain or replace" the dam which, admittedly, was the property of Bilodeau. Although the referee did not define the type of easement owned by the Town, we conceive it to be an "easement in gross" and not one appurtenant to land of the Town because the Town owned no such land. *Reed v. A. C. McLoon & Company*, Me., 311 A.2d 548, 552 (1973).

The dam, obviously, is a structure, and we must consider when an easement in

---

1. The referee also concluded that his ultimate conclusion was "strengthened by the application of the doctrine of equitable estoppel." In view of the result announced this issue need not be dealt with and we indicate no opinion thereon. *But see Davis v. Briggs*, 117 Me. 536, 105 A. 128 (1918).

gross attached to a structure may be extinguished. Clearly, inadvertent destruction of a structure would terminate any easement thereon because the easement does not involve any interest in the soil apart from the building. *Bonney v. Greenwood,* 96 Me. 335, 341, 52 A. 786, 789 (1902). While an intentional termination of an easement which is appurtenant to land of another may, under given circumstances, be enjoined,[2] the same rule does not necessarily apply to easements in gross.

Here, undisputed facts disclose an intention to destroy an obsolete structure over which the Town has an easement in gross.

■ We conclude that, under those circumstances, the better reasoned precedents support the right to destroy such a structure and thus eliminate the so-called easement. The general rule—followed by a majority of jurisdictions—supports the rule that an easement in a structure, coupled with no interest in the land, ordinarily is extinguished by the destruction of the structure. Since the easement is only in the structure, and not in the soil, there is no longer a servient tenement in existence upon which the right can operate. *See* Annot., 154 A.L.R. 82.

The Massachusetts court states the rule as follows:

> "If the structure ceases to exist, the right ends as there is nothing upon which it can be exercised. This is because the owner of the servient estate is not obliged to replace the [structure] when it ceases to exist by reason of decay, earthquake, tornado, fire or its destruction otherwise caused without the fault or act of the owner. . . . The same result follows where the [structure] on the dominant tenement is destroyed by voluntary or involuntary act, or is substantially changed. The right is not one appurtenant to the estate as a whole, but is limited by intendment to the [structure] in connection with which it is used. . . ."

*Union Nat. Bank v. Nesmith,* 238 Mass. 247, 130 N.E. 251, 252 (1921). While *Rothschild v. Wolf,* 20 Cal.2d 17, 123 P.2d 483 (1942), arguably, may reach a contrary result, note the following excerpt therefrom:

> "[W]e do not wish to be understood as intimating that depreciation or obsolescence of a building may not in the course of time so far progress as to impair property rights in the further maintenance thereof even though not to the extent of being the equivalent of destruction of such building. . . ."

123 P.2d at 484. *See also Winterringer v. Price,* Okl., 370 P.2d 918, 923 (1961).

On the facts before the referee, the Bilodeau property had become an economic liability. The dam was incorporated structurally in the mill and was also without value to the owner. If Bilodeau was to salvage anything from his ownership of this realty, the structures thereon had to be demolished and thus make the underlying land available for commercial use. We hold that the clause in the 1970 deed did not prevent this. The Town's easement would cease to exist when the demolition was consummated.

The entry is:

Appeal denied.

Cross-appeal dismissed.

Judgment affirmed.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

---

**2.** *But see Davis v. Briggs, supra.*